Barbara GONZALES, Plaintiff,

v.

AMERICAN FAMILY LIFE
ASSURANCE COMPANY,
Defendant.

No. 00–CV–74(HL).

United States District Court,
M.D. Georgia,
Columbus Division.

Feb. 8, 2002.

Allan Leroy Parks, Jr., Atlanta, GA, Alysa B. Freeman, Atlanta, GA, for plaintiff.

Ruth W. Woodling, Jeffery E. Robertson, Atlanta, GA, for defendant.

### ORDER

LAWSON, District Judge.

Before the Court is Defendant's Motion for Summary Judgment (Tab # 34). The Court hereby grants the Motion and enters the following findings of fact and conclusions of law.

### I. FINDINGS OF FACT

In October of 1985, Plaintiff, Barbara Gonzales, a white female, began working for American Self Care Corporation ("ASCO"), a subsidiary of American Family Life Assurance Company ("AFLAC"). ASCO specialized in third party administration ("TPA") of employee benefit contracts. From 1985 until 1987, Plaintiff held the position of Claims Manager and supervised approximately ten employees in that position. (Gonzales Dep. at 27–28.) In 1987 or 1988, Plaintiff was promoted to the position of Director of Administrative Services, supervising 23 employees. (Gonzales Dep. at 27–28.) Plaintiff ended her employment with ASCO in December of 1989 and has had no further work experience with a TPA.

In January 1990, Plaintiff started working for ASCO's parent company, AFLAC, as a Lead Benefit Analyst in the Human Resources Department. (Compl.¶ 9.) Plaintiff's job duties included assisting employees with their benefit orientations, assisting with reconciliation of benefit plans, and handling the workers compensation program. In addition, Plaintiff supervised two benefit technicians. (Gonzales Dep. at 55.)

In October of 1991, Plaintiff was promoted to Benefits Manager. (Compl.¶ 11.) Many of Plaintiff's job duties remained the same, though she also took on additional duties which she describes as "plan administrator duties." (Gonzales Dep. at 56.) As Benefits Manager, Plaintiff supervised four employees. (Gonzales Dep. at 56.) Plaintiff was the Benefits Manager until 1993, when she was asked to handle only the plan administrator duties. (Gonzales Dep. at 60.) As Plan Administrator, Plaintiff did not supervise any employees. (Gonzales Dep. at 60.)

In 1993, Plaintiff submitted a letter of resignation to her supervisor, Mildred Paradiso, Second Vice President of Human Resources. (Henderson Aff. ¶ 8.) Plaintiff stated she was resigning due to gender

harassment, compensation, and advancement issues. (Gonzales Dep. at 103.) Ms. Paradiso contacted Plaintiff and requested that she stay at AFLAC, which Plaintiff did. (Gonzales Dep. at 135.) Plaintiff's resignation was not processed. (Henderson Aff. ¶ 9.)

In May of 1997, Plaintiff was promoted to the position of Manager of the Benefits Department with responsibility for both the Company's health insurance plans and retirement plans. (Hart Aff. ¶ 6.)

In 1998, AFLAC made the decision to either acquire or develop a new TPA. Diane Orr, Senior Vice President of Claims, began the process of finding and interviewing candidates to fill the newly-created position of Vice President, TPA Operations. (Orr Aff. ¶¶ 1–2.)

After being provided with a copy of the job description for the Vice President, TPA Operations position, Plaintiff applied for the position. (Gonzales Dep. at 141–44.) The job description stated as one of its requirements that the applicant have a four year college degree and ten years of experience in insurance operations or TPA services and systems. (Pl.'s Resp. to Def.'s Mem.Supp.Summ.J. Ex. G.) Plaintiff did not have a four year college degree, she only had an associates degree from Columbus College. (Gonzales Dep. at 23.) Nevertheless, Plaintiff provided a resume to Ms. Orr; however, Plaintiff was never interviewed for the position. (Gonzales Dep. at 141–44.)

Ms. Orr submitted a memorandum to AFLAC's Human Resources Department requesting assistance in the search for a candidate. An advertisement was placed in the Wall Street Journal on April 27, 1998 and in the National Underwriter on May 11, 1998. AFLAC received approximately 35–40 responses. None of the individuals responding had the required background and experience for the position. (Resp. to Pl.'s First Interrogs. to Def. ¶ 4.)

To assist AFLAC in its search to fill this position, Ms. Orr engaged the services of an executive recruiting service. Ms. Orr informed the recruiters that she was only interested in individuals who were highly skilled executives, and she specifically instructed them not to look for generalists in the field. (Orr Aff. ¶ 2.)

The recruiting service presented Ms. Orr with seven candidate briefs for review. Of these seven, six were male and one was female. AFLAC extended an offer to one of the candidates, Mr. Edward Koufer, on September 21, 1998. Mr. Koufer did not accept the offer. The search resumed, and the recruiting service presented Mr. Robert Ottman as an additional candidate for consideration. After a telephone interview and an interview in Columbus, AFLAC extended an offer to Mr. Ottman on January 5, 1999. Mr. Ottman accepted the position and was hired in February of 1999. (Resp. to Pl.'s First Interrogs. to Def. ¶ 4.) Mr. Ottman had been a Vice President of a major TPA operation for ten years and had significant experience in managing a TPA Operation and in TPA acquisition; he also had a bachelor's degree.

In late 1998, the AFLAC Human Resources division was restructured. AFLAC's Human Resources Department was made up of two divisions: Human Resources Services, which dealt with employee and personnel issues, and Human Resources Support, which primarily dealt with technical and financial issues, though the Support division was also responsible for compensation, benefits, and human resource information systems. Ms. Angela Hart, Senior Vice President, had full responsibility for AFLAC's Human Resources Department.

Ms. Hart asked the Plaintiff, as well as the other managers and officers in the Human Resources department, to present

her with a business plan as to how the department could be restructured. (Gonzales Dep. at 76.) According to the Plaintiff, Ms. Hart told her that AFLAC was considering new strategic directions and Ms. Hart wanted the Plaintiff in a position where she would be involved in assisting Ms. Hart in those decisions, thereby removing Plaintiff from the day-to-day operations of the benefits department. (Gonzales Dep. at 151–52.) Plaintiff submitted her plan to Ms. Hart, in which Plaintiff recommended that she be promoted to the position of Vice President of Human Resources. (Gonzales Decl. ¶ 29.)

Despite Plaintiff's request, Ms. Sharon Hill Douglas, a black female, was promoted to the position in January 1999. (Gonzales Decl. ¶ 30.) Ms. Douglas had been hired by AFLAC in May of 1996 to fill the position of Second Vice President of Human Resources Services. (Hart Aff. ¶ 4.) Prior to coming to AFLAC, Ms. Douglas had been Vice President, Customer and Employee Services, Director of Human Resources for the Columbus Waterworks. In that position, she directed the entire Human Resources Division for the Columbus Waterworks. Ms. Douglas also has a bachelor's degree in business and computer science. (Hart Aff. ¶ 4.) In mid–1998, Ms. Douglas met with Mr. Kriss Cloninger, Executive Vice President and Chief Financial Officer of AFLAC, to discuss an offer she had received from AFLAC's Marketing Department to become Vice President in that department. (Cloninger Aff. ¶ 2.) At the meeting, Mr. Cloninger told Ms. Douglas that AFLAC wanted to keep her in Human Resources, and that if her job performance continued at the same high level for the next several months, she would be promoted to Vice President of Human Resources. Ms. Douglas subsequently told Mr. Cloninger that she would decline the offer from Marketing based on his assurances. (Cloninger Aff. ¶ 3.)

In January 1999, Ms. Douglas was promoted to Vice President, Human Resources Services. (Cloninger Aff. ¶ 4.) After Ms. Douglas' promotion, Mildred Paradiso, Second Vice President of Human Resources Support, spoke with Mr. Cloninger about Ms. Douglas' promotion. Ms. Paradiso inquired why she had not also been promoted. (Cloninger Aff. ¶ 5.) Mr. Cloninger told Ms. Paradiso that Ms. Douglas had previously been offered a Vice President position in Marketing and that the Company had determined that because of her job duties and performance, the Company had no alternative but to promote her to Vice President in Human Resources. (Cloninger Aff. ¶ 5.) After this discussion, Ms. Paradiso, Plaintiff's supervisor, informed Plaintiff that she was told that Ms. Douglas was promoted because "the company had to promote" her. Plaintiff contends that Ms. Paradiso stated that she believed Ms. Douglas had been promoted due to her race; however, Plaintiff concedes that Ms. Paradiso never told Plaintiff that Mr. Cloninger had made any reference to Ms. Douglas' race. (Gonzales Dep. at 248–49.)

Plaintiff started looking for another position in mid–1998 (Gonzales Dep. at 31.) Plaintiff applied for a position with the State of Florida in January of 1999. (Gonzales Dep. at 31.) Plaintiff resigned from her position with AFLAC on April 20, 1999. Her final day of work was May 4, 1999. (Gonzales Decl. ¶ 38.)

In May 1999, Plaintiff started working for the Bureau of Operations with the State of Florida. (Gonzales Decl. ¶ 49.) In March 2000, Plaintiff became the Acting Director of the State Group Insurance Division, and in October 2000, she formally became the head of this department. (Gonzales Decl. ¶ 50.)

According to the Complaint, Plaintiff filed a timely Charge of Discrimination

with the Equal Employment Opportunity Commission ("EEOC"), and the EEOC issued a Right to Sue Notice to the Plaintiff, on or about September 23, 1999. (Compl.¶¶ 24–25.) [1]

Plaintiff filed her Complaint on December 27, 1999. The Complaint contains four counts: (1) race or ethnic discrimination in violation of 42 U.S.C. § 1981 due to Defendant's non-selection of the Plaintiff due to her race for a position for which she was qualified, (2) race discrimination in violation of Title VII since Defendant refused Plaintiff a promotion and took other adverse employment action against Plaintiff based upon her race, (3) gender discrimination in violation of Title VII since Defendant refused Plaintiff a promotion and took other adverse employment action against Plaintiff based upon her gender, in violation of Title VII, 42 U.S.C. § 2000e et seq., and (4) violation of the equal pay act.

## II. CONCLUSIONS OF LAW

### A. Summary Judgment Standard

"[T]he plain language of Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment, after adequate time and discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The nonmoving party must put forth more than a "mere 'scintilla'" of evidence; "there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir.1990).

A district court "can only grant summary judgment 'if *everything* in the record ... demonstrates that no genuine issue of material fact exists.'" *Tippens v. Celotex Corp.,* 805 F.2d 949, 952 (11th Cir.1986) (emphasis in original) (citation omitted). Genuine disputes are those where the evidence is such that a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

In deciding whether a genuine factual issues exist, the court must accept the truth of Plaintiff's evidence and must draw all reasonable inferences in Plaintiff's favor. *Cottrell v. Caldwell,* 85 F.3d 1480, 1486 n. 3 (11th Cir.1996). The court may not weigh conflicting evidence or make credibility determinations. *Hairston v. Gainesville Sun Publ'g Co.,* 9 F.3d 913, 919 (11th Cir.1993).

### B. Sex Discrimination under Title VII

Plaintiff argues that AFLAC discriminated against her by hiring Mr. Robert Ottman, "a less qualified male," for the position of Vice President, TPA Operations. (Gonzales Decl. ¶ 24.)

In a Title VII case, a plaintiff may attempt to establish a prima facie case of discrimination through either direct or indirect evidence. *Schoenfeld v. Babbitt,* 168 F.3d 1257, 1266 (11th Cir. 1999). Direct evidence of discrimination is evidence, that, "if believed, proves [the] existence of [a] fact in issue without inference or presumption." *Burrell v. Bd. of Trs. of Ga. Military Coll.,* 125 F.3d 1390, 1393 (11th Cir.1997) (citations omitted).

---

**1.** The Court notes that the Third Defense listed in the Defendant's Answer provides that Plaintiff failed to satisfy the conditions precedent to filing an action under Title VII to the extent that any of the Plaintiff's claims were not included in an administrative charge filed with the EEOC. As the Defendant did not include a copy of the administrative charge to the Court, the Court is unable to consider the merits of the Defendant's argument with respect to this issue.

Direct evidence is composed of "only the most blatant remarks, whose intent could be nothing other than to discriminate" on the basis of some impermissible factor. *Carter v. City of Miami,* 870 F.2d 578, 582 (11th Cir.1989).

Since Plaintiff has produced no direct evidence, she must rely on the test set out in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to establish her prima facie case of discrimination through circumstantial evidence. *Arrington v. Cobb County,* 139 F.3d 865, 873 (11th Cir.1998).

In *McDonnell Douglas,* the Supreme Court provided the shifting burdens of production and proof for determining whether or not an employer illegally discriminated against an employee. 93 S.Ct. at 1824. The three-part test created by the Court requires, first, that the plaintiff has the burden of proving a *prima facie* case of discrimination by a preponderance of the evidence. *Id.*

Once the plaintiff has established a prima facie case of discrimination, the burden shifts to the employer "to articulate some legitimate, non-discriminatory reason" for the alleged discriminatory action. *McDonnell Douglas,* 93 S.Ct. at 1824. The employer's burden of rebuttal is light: "the defendant need not ·persuade the court that it was actually motivated by the proffered reasons . . . it is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). If the employer produces such a reason, the plaintiff must then prove that the legitimate reason offered was a mere pretext for an illegal motive. *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1528 (11th Cir.1992) (citing *McDonnell Douglas,* 93 S.Ct. at 1824).

■ To establish a prima facie case of Title VII sex discrimination in a promotional decision, a plaintiff must prove: (1) that she is a member of a protected minority, (2) that she was qualified and applied for the promotion, (3) that she was rejected despite these qualifications, and (4) that other equally or less qualified employees who are not members of the protected minority were promoted. *Lee v. GTE Fla., Inc.,* 226 F.3d 1249, 1253 (11th Cir.2000) (citing *Taylor v. Runyon,* 175 F.3d 861, 866 (11th Cir.1999)).

■ As a female, Plaintiff is a member of a protected group. She lost the position at issue (Vice President, TPA Operations) to Mr. Ottman, who—as a male—is not a member of a protected class. However, these undisputed facts are not sufficient to result in the Plaintiff meeting her prima facie burden.

The Plaintiff fails to establish that she was qualified for the Vice President, TPA Operations position or that Mr. Ottman was equally or less qualified than she was. Plaintiff has the burden of proving that she was qualified for the position. Plaintiff attempts to meet this burden by stating her personal belief that her experience at AFLAC makes her qualified for the position: "I firmly believe that my extensive knowledge of AFLAC systems gained after 13 years employment and my consistently exemplary performance with the company, as well as my cumulative experience in insurance operations, provided me with excellent qualifications to successfully compete for and obtain this new position and promotion." (Gonzales Decl. ¶ 19.)

Despite this belief, the Court notes that the job requirement specifically states that a four year college degree was required, as well as ten years experience in insurance operations or TPA services and systems. (Pl.'s Resp. to Def.'s Mem.Supp.Summ.J. Ex. G.) While the Defendant questions

whether Plaintiff's four years at ASCO were all in the TPA services field, viewing the facts in a light most favorable to the Plaintiff, the Court will assume that they were. The Court will also assume that Plaintiff's work at AFLAC qualifies as "experience in insurance operations," and thus for purposes of this motion, the Court finds that Plaintiff met this element of the job requirement. However, the education qualification for this position requires a four year college degree. There is no factual dispute that Plaintiff does not meet this qualification. While Plaintiff does have an associates degree from Columbus College, an associates degree is not a bachelor's degree. Thus, the Court finds that the Plaintiff has not proven that she is qualified for the position and thus fails to prove an essential element of her prima facie case.

Further, the Court finds that the Plaintiff failed to meet another essential element of her prima facie case, for she did not prove that Mr. Ottman was equally or less qualified than herself. Mr. Ottman had been a Vice President of a major TPA operation for ten years and had significant experience in managing a TPA Operation and in TPA acquisition, while Plaintiff's only experience with a TPA was over nine years earlier, when she worked as a Claims Manager and Director of Administrative Services at ASCO. Further, Mr. Ottman had a bachelor's degree while the Plaintiff did not; she had not attended college since 1984. (Gonzales Dep. at 21–23.)

During her deposition, Plaintiff conceded that she did not know of Mr. Ottman's qualifications such as how many years he had worked with a TPA; however, Plaintiff contends she was better qualified because of her familiarity with AFLAC and the products that they sold. (Gonzales Dep. at 147–48, 150.) Plaintiff believes she was better qualified for the position by virtue of her training and experience at AFLAC. (Pl.'s Statement of Material Facts ¶ 11.) Despite Plaintiff's belief that her familiarity with AFLAC supercedes Ottman's qualifications, Plaintiff concedes that she never inquired as to whether AFLAC thought this quality was important. (Gonzales Dep. at 148.) AFLAC placed advertisements for this position in national newspapers and hired a recruiting service to help it find potential candidates; by taking these measures, AFLAC has shown that it did not value experience at AFLAC in the same light as the Plaintiff. The Court finds that Plaintiff's personal belief that her experience at AFLAC makes her more qualified is insufficient to establish this element of the prima facie case. Based on these reasons, the Court finds that Plaintiff has failed to establish that she is more or equally qualified as Mr. Ottman.

Due to Plaintiff's failure to meet two essential elements of her prima facie case, the Court grants summary judgment to the Defendant with respect to Plaintiff's gender discrimination claim.

## C. Race Discrimination in Violation of Title VII and § 1981

Plaintiff makes a second claim of discrimination in promotion under both Title VII and § 1981. (Compl.¶¶ 28–32.) Plaintiff alleges that Defendant discriminated against her because of her race, which is white, by promoting a black female, Ms. Sharon Douglas, to the position of Vice President, Human Resources Service.

Since the framework for establishing a prima facie case of employment discrimination is the same for claims brought under Title VII and § 1981, the following analysis will apply to both of Plaintiff's race discrimination claims. *See Arrington,* 139 F.3d at 873 n. 16.

To establish a prima facie case of discriminatory failure to promote, a plain-

tiff must prove: (1) she is a member of a protected minority, (2) she was qualified and applied for the promotion, (3) she was rejected, and (4) other equally or less qualified employees who are not members of the protected minority were promoted. *Denney v. City of Albany,* 247 F.3d 1172, 1183 (11th Cir.2001).

■ Once again, the Court finds that the Plaintiff failed to meet her prima facie case. She has not proven that she was qualified for the position, nor has she proven that an equally or less qualified employee who is not a member of the protected minority was promoted.

AFLAC's Human Resources Department is made up of two divisions: Human Resources Services and Human Resources Support. The former is employee and personnel related while the latter is primarily technical and financial. The position that Plaintiff contends she was qualified for is the Vice President of Human Resources Position which was in the Human Resources Services division. Plaintiff has never been employed in the Services division, she was always employed in the Support Division.

Despite never having been employed in the Services division, Plaintiff claims she did extensive work for the Services division, including writing requested articles on the Human Resources Services Division, establishing policies, and writing handbooks.[2] Plaintiff claims that based on her experience in this Division, she was often asked to meet with officers and employees who were about to be separated from the company in order to finalize their severance agreements. She also claims to have been extensively involved with family leave, medical leave, and disability matters, all of which she states are concerns of the Human Resources Services Division. (Gonzales Decl. ¶¶ 26–27.)

When questioned about her experience in employee relations, Plaintiff conceded that she had no actual experience. (Gonzales Dep. at 81, 156–57.)

Ms. Angela Hart, Senior Vice President with full responsibility for AFLAC's Human Resources Department stated that Plaintiff was not considered for the position of Vice President, Human Resources Services. Hart states that Plaintiff did not have any expertise in the area of employee services and did not have a bachelor's degree. (Hart Aff. ¶ 7.)

The Court is not convinced that the Plaintiff was qualified for the position; however, the Court does not have to find that the Plaintiff failed to meet her prima facie case for this reason, for the Plaintiff also fails to prove that Ms. Douglas was equally or less qualified.

Plaintiff admits she has little knowledge with respect to Ms. Douglas' prior work experience or educational background. Plaintiff was unaware of Ms. Douglas' job performance at AFLAC. Plaintiff did not know that Ms. Douglas had been offered another position in Marketing and had turned it down after AFLAC informed her of their desire to keep her in Human Resources. Plaintiff did not realize that Ms. Douglas had had three years of experience at AFLAC before she was promoted. (Gonzales Dep. at 156.) When asked about Ms. Douglas' former work experience, Plaintiff knew she had worked at Columbus Waterworks, but believed her to be a manager while Ms. Douglas had actually been a Vice President there for three years where she directed the entire Human Resources division.

---

**2.** Plaintiff stated that writing the employee handbook was a team effort, in which the management staff in human resources would go through and preview the handbook and make recommendations for changes. Plaintiff concedes that Mildred Paradiso and Sharon Douglas both participated in this process as well. (Gonzales Dep. at 81–82.)

Prior to her promotion, Ms. Douglas was AFLAC's Second Vice President, Human Resources Services. Thus, Ms. Douglas had been employed in the Services division of Human Resources for three years, while the Plaintiff had never been employed in the Services division.

Despite Ms. Douglas' extensive work experience at Columbus Waterworks and at AFLAC, as well as her bachelor's degree in business and computer science, Plaintiff still believes she is more qualified than Douglas: "I felt that I had, again, the background and the training and the subject matter expert of the human resources department to be equally qualified for this position." (Gonzales Dep. at 156.) In her Response to Defendant's Motion for Summary Judgment, Plaintiff contends that she had "more than sufficient on-the-job experience to qualify for the position despite any lacking in her formal education." (Pl.'s Resp. to Def.'s Mem.Supp.Summ.J. at 13.)

During her deposition, Plaintiff was asked why the plan which she had submitted to Ms. Hart provided for her to become a vice president instead of a second vice president. Plaintiff responded that she felt more competent than the two second vice presidents that were on the staff in the Human Resources department: Mildred Paradiso and Sharon Douglas. (Gonzales Dep. at 79–80.) Plaintiff believed she was more competent that Ms. Douglas because Ms. Douglas handled issues related to employee services and employee relations while Plaintiff, having been in the human resources department since 1990, contends she had been cross-trained in some of those areas through the years. However, when questioned about her experience in employee relations, Plaintiff conceded that she had no actual experience. (Gonzales Dep. at 81.)

Once again, the Court will not deem Plaintiff's personal belief of her qualifications to be sufficient to prove an element of her prima facie case of discrimination. The court for the Eleventh Circuit Court of Appeals has commented on employees' beliefs that they are qualified: "an employee's own opinions about his ... qualifications [do not] give rise to a material factual dispute. ... When two candidates are equally qualified in that they both possess the objective qualifications for the position and neither is clearly better qualified, it is within the employer's discretion to choose among them so long as the decision is not based on unlawful criteria." *Lee*, 226 F.3d at 1253–54 (quoting *Simms v. Oklahoma ex rel. Dep't of Mental Health and Substance Abuse Serv.*, 165 F.3d 1321, 1329–30 (10th Cir.), *cert. denied*, 528 U.S. 815, 120 S.Ct. 53, 145 L.Ed.2d 46 (1999)) (internal quotations and citations omitted). Though these comments were made when an employee was attempting to prove pretext, the Court finds them to be applicable in its determination as to whether the Plaintiff has proven that she is as qualified as Ms. Douglas.

Upon consideration of Plaintiff's argument that she is more qualified than Ms. Douglas even though she does not have a bachelor's degree, has no actual work experience in employee services, and has never been employed in the Human Resources Services Department, the Court finds Plaintiff has failed to establish that she is more or equally qualified than Ms. Douglas.

The Court notes Plaintiff's claim that her supervisor, Ms. Mildred Paradiso, told Plaintiff that she thought Ms. Douglas had been promoted because of her race. Ms. Paradiso was a non-decision maker. Plaintiff admits that this was Ms. Paradiso's belief; it was not said by Mr. Cloninger. Plaintiff was never told and never heard that Executive Vice President Kriss Cloninger stated Ms. Douglas was promot-

ed because of her race. Thus, this statement plays no part in supporting the Plaintiff's prima facie case. The statement does not show an intent to discriminate. The statement is merely Ms. Paradiso's opinion as to why Ms. Douglas was promoted. Plaintiff has put forth no evidence that shows a decision maker in the promotion process made the decision to promote Ms. Douglas based on her race.

Due to Plaintiff's failure to meet her prima facie case, the Court grants summary judgment to the Defendant with respect to Plaintiff's race discrimination claims.

### D. Equal Pay Act

■ In Plaintiff's Response to Defendant's Memorandum of Law in Support of Defendant's Motion for Summary Judgment, Plaintiff addresses her Equal Pay Act claim. Plaintiff argues that she assumed numerous additional duties in 1991, and that she accepted the duties with the implied understanding that her compensation would be made commensurate for her handling these additional responsibilities. (Pl.'s Resp. at 18.)

Plaintiff's claim under the Equal Pay Act is time barred.[3] The Act provides that a suit must be filed within two years after the cause of action accrues, or within three years in the case of a willful violation. 29 U.S.C.A. § 255(a). Plaintiff brought this suit in 1999, eight years after her cause of action accrued.

Further, the Court notes that Plaintiff did not assert jurisdiction under the Equal Pay Act in her Complaint or in her Responses to Mandatory Disclosures. (Compl. ¶ 1; Pl.'s Resp. to Mandatory Disclosures ¶ 2.)

For these reasons, the Court grants summary judgment to the Defendant with respect to Plaintiff's Equal Pay Act claim.

### III. CONCLUSION

Based on the above analysis, the Court **GRANTS** Defendant's Motion for Summary Judgment (Tab # 34) with respect to all of the Plaintiff's claims.

---

3. This Court is unclear as to whether Plaintiff attempted to bring a wage discrimination claim under Title VII. Plaintiff refers to this case as a "disparate wage act case," yet appears to bring her wage claim only under the Equal Pay Act. *See* Pl.'s Resp. 1, 17–18. In Defendant's Memorandum in Support of Summary Judgment, Defendant assumed Plaintiff had brought a disparate wage claim under Title VII and argued that it was entitled to summary judgment on this claim. Plaintiff did not respond to this argument in her Response. Assuming Plaintiff did bring this claim, the Court finds this claim is time barred. Title VII requires plaintiffs to file a charge of discrimination with the EEOC "within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C.A. § 2000e–5(e)(1). Thus, as the Defendant pointed out in its Memorandum Supporting Summary Judgment, Plaintiff is barred from seeking relief or damages for alleged discrimination occurring more than 180 days prior to the filing of the EEOC charge on May 29, 1999. (Def.'s Mem.Supp. Summ.J. at 11.)